

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-23-00087-CV

THE STATE OF TEXAS FOR
THE BEST INTEREST AND PROTECTION OF C.C.

On Appeal from the 354th District Court
Hunt County, Texas
Trial Court No. 32861CR

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens

## MEMORANDUM OPINION

C.C. appeals from the trial court's judgment ordering extended, in-patient mental health services (recommitment judgment) and its Order to Administer Psychoactive Medication (medication order). According to C.C., the evidence was (1) legally insufficient to support the recommitment judgment and (2) legally and factually insufficient to support the medication order. We find that there was legally sufficient evidence to support the trial court's recommitment judgment, but we reverse the trial court's order to administer drugs and remand this case to the trial court for proceedings consistent with this opinion.

## I. Background

On July 26, 2019, C.C. was indicted for murder by a Hunt County jury. On October 18, 2019, the trial court entered an Agreed Judgment of Incompetency and Commitment to Mental Health Facility. The agreed judgment committed C.C. to a mental-health facility "for further examination and treatment toward the specific objective of the Defendant attaining competency to stand trial." *See* TEX. CODE CRIM. PROC. ANN. art. 46B.073 (Supp.).

On November 18, 2021, the trial court held a recommitment hearing, finding by clear and convincing evidence (1) that C.C. was "likely to cause serious harm to others," (2) that, if he did not continue treatment, he would "continue to suffer severe and abnormal mental, emotional, or physical distress," and (3) that he was "unable to make a rational and informed decision" regarding his treatment. The court also found by clear and convincing evidence that C.C.'s condition was expected to continue for more than ninety days and that he had "[r]eceived in-patient mental health services under court ordered [sic] pursuant to this code for at least 60

2

consecutive days within 12 months immediately preceding the hearing." C.C. appealed. The Dallas Court of Appeals affirmed the trial court's judgment. *See In re C.C.C.*, No. 05-21-01028-CV, 2022 WL 1438939, at *4–5 (Tex. App.—Dallas May 6, 2022, no pet.) (mem. op.).

On November 4, 2022, the trial court held another recommitment hearing. Following the hearing, the trial court signed another judgment extending C.C.'s commitment for in-patient mental health services for up to twelve months. C.C. appealed. Again, the Dallas Court of Appeals affirmed the trial court's judgment. *See In re C.C.*, 05-22-01224-CV, 2023 WL 1813501, at *6 (Tex. App.—Dallas Feb. 8, 2023, no pet.) (mem. op.).

This appeal arises from the entry of (1) the trial court's October 23, 2023, recommitment judgment, extending in-patient mental health services for C.C., and (2) its October 24, 2023, medication order. The judgment and order were entered after hearings took place on October 18 and October 23. The trial court heard testimony from Dr. Feroz Yaqoob, Dr. Kevin Brown, and C.C. Further, without objection, the trial court admitted into the record the certifications of both doctors that they had examined C.C. for mental illness.

Following the October 23 hearing, the trial court entered a judgment extending C.C.'s in-patient mental health services, finding, among other things, that C.C. was "likely to cause serious harm to" himself or others. The court also found,

> [C.C] will, if not treated, continue to suffer severe and abnormal mental, emotional or physical distress and is experiencing substantial mental or physical deterioration of his/her ability to function independently which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for his basic needs, including food, clothing, health or safety; and is unable to make a rational and informed decision as to whether or not to submit to treatment. The Court further finds, by clear convincing evidence, that:

3

( )     a recent overt act has occurred; and/or

(✓)     a continuing pattern of behavior that tends to confirm:

     (✓)     the likelihood of serious harm to the proposed patient or others. . . .

The trial court ordered C.C. "committed for Court-Ordered Mental Health Services to **NORTH TEXAS STATE HOSPITAL – VERNON CAMPUS** for a period of time not to exceed __12___ months." This appeal followed.

## II. Standards of Review

According to C.C., (1) the evidence was legally insufficient to support the trial court's recommitment judgment, and (2) the evidence was legally and factually insufficient to support the trial court's medication order or, alternatively, the medication order was entered without the required hearing.

Because the State's burden of proof is clear and convincing evidence, we apply a heightened standard of review. *See In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In reviewing the legal sufficiency of the evidence where the burden of proof is clear and convincing evidence, we consider "all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding[s were] true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We "must assume that the [trier of fact] resolved disputed facts in favor of its finding if a reasonable [trier of fact] could do so," and we must disregard all contrary evidence that a reasonable trier of fact could have disbelieved or found to be incredible. *Id.*

4

When an appellate court reviews the factual sufficiency of a fact-finder's findings, it "must consider and weigh all the evidence and should set aside a finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust." *L.S. v. State*, 867 S.W.2d 838, 841 (Tex. App.—Austin 1993, no writ) (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam)).

## III.    Applicable Law

Section 574.035, subsections (a)(1) through (4), of the Texas Health and Safety Code, entitled Order for Extended Inpatient Mental Health Services, is applicable to this case pursuant to Article 46B.102(b) of the Texas Code of Criminal Procedure.[1]  Section 574.035, subsections (a)(1) through (4), state that a court may order extended, in-patient mental health services only if it finds by clear and convincing evidence that:

    (1)    the proposed patient is a person with mental illness;

    (2)    as a result of that mental illness the proposed patient:

        (A)    is likely to cause serious harm to the proposed patient;

        (B)    is likely to cause serious harm to others; or

        (C)    is:

            (i)    suffering severe and abnormal mental, emotional, or physical distress;

---

[1] Article 46B.102(b) states,

> (b)    Proceedings for commitment of the defendant to court-ordered mental health services are governed by Subtitle C, Title 7, Health and Safety Code, to the extent that Subtitle C applies and does not conflict with this chapter, except that the criminal court shall conduct the proceedings whether or not the criminal court is also the county court.

TEX. CODE CRIM. PROC. ANN. art. 46B.102(b) (footnote omitted) (citation omitted).

(ii) experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health, or safety; and

(iii) unable to make a rational and informed decision as to whether or not to submit to treatment;

(3) the proposed patient's condition is expected to continue for more than 90 days; and

(4) the proposed patient has received court-ordered inpatient mental health services under this subtitle or under Chapter 46B, Code of Criminal Procedure, for at least 60 consecutive days during the preceding 12 months.

TEX. HEALTH & SAFETY CODE ANN. § 574.035(a)(1)–(4) (Supp.). If the court finds that the proposed patient meets the criteria of subsection (a), it "must specify which criterion listed in Subsection (a)(2) forms the basis for the decision." TEX. HEALTH & SAFETY CODE ANN. § 574.035(c) (Supp.). Furthermore, subsection (e) provides:

(e) To be clear and convincing under Subsection (a), the evidence must include expert testimony and evidence of a recent overt act or a continuing pattern of behavior that tends to confirm:

(1) the likelihood of serious harm to the proposed patient or others; or

(2) the proposed patient's distress and the deterioration of the proposed patient's ability to function.

TEX. HEALTH & SAFETY CODE ANN. § 574.035(e) (Supp.). An appellate court will affirm a trial court's recommitment order if there is legally and factually sufficient evidence to support any finding under subsection (a) of Section 574.035. *L.S.*, 867 S.W.2d at 841 (finding that "[o]nly one statutory criterion must be met under section 574.035(a)(2)").

## IV. Discussion

### A. Legally Sufficient Evidence Supported the Trial Court's Recommitment Judgment

In his first point of error, C.C. contends that the evidence was legally insufficient to support the trial court's findings (1) that, if C.C. did not remain hospitalized, the threat of harm to others was substantial and that the threat was based on actual dangerous behavior manifested by some overt act or threats in the recent past and (2) that C.C. was experiencing substantial mental or physical deterioration of his ability to function independently, which was exhibited by his inability to provide for his basic needs, including food, clothing, health, or safety.

At the October 18 hearing, Feroz Yaqoob, a psychiatrist working at the North Texas State Hospital in Vernon, testified that "[C.C.'s] current diagnosis was schizophrenia." Based on C.C.'s history and his ongoing psychosis, Yaqoob explained that his opinion was "based on the delusions that [C.C.] still continue[d] to harbor." Yaqoob continued,

> He is still concerned about the ring in his throat. He –. . . has very poor insight into his illness. He thinks that his charges have been dropped or, you know, he's already served his time.
>
> He has tried to elope from the hospital once . . . in June this year. He has these chronic delusions, you know, related to his charge, you know, to a certain ring in his throat. He does have a pretty serious charge that is still pending.

Yaqoob opined, "[A]lthough he hasn't really acted on those delusions, there is always a risk of somebody, you know, having that kind of refractory psychosis or refractory symptoms of schizophrenia, acting on those delusions at any point. That's what, I think, places him at risk to others." Further, Yaqoob stated that he did not believe that C.C. would be capable of functioning independently in society. "I think he needs continued care in a structured environment, right

7

down to a maximum security facility. That needs to continue until he is stable enough to be discharged to a less restrictive hospital for ongoing competency restoration." Likewise, Yaqoob did not believe that C.C. "would be able to meet his basic needs like food, shelter, [and] housing." It was also Yaqoob's belief that C.C.'s condition was likely to continue for more than ninety days. According to Yaqoob, C.C.'s prognosis was "fair," and there was a chance his competency to stand trial might be restored in the foreseeable future, but "it may just take him some time to be restored." But Yaqoob also stated that some of C.C.'s symptoms, such as "chronic delusions," might be more "difficult to treat." In the final analysis, Yaqoob believed that C.C. should continue in-patient treatment at Vernon State Hospital.

At the October 23, 2023, hearing, Kevin Brown, a board-certified psychiatrist, stated that, on October 5, 2023, he evaluated and examined C.C. and that he eventually prepared a certificate of medical examination for mental illness. According to Brown, he confirmed that C.C. "still ha[d] a diagnosis of schizophrenia that [had not] changed." But he also stated, "It looks like [C.C.]'s made some improvement." Brown stated that C.C. might possibly be a danger to others "just by virtue of him not accepting that he has a mental illness and that he's still quite delusional and -- about him being free." According to Brown, C.C. believed that "[he was] going to walk out of court, that he [did not] have any charge, that this [was] all behind him." Brown continued, "He . . . still has the belief that he has some kind of throat ring that is able to squeeze down on his throat or control him in some way."[2] Like Yaqoob, Brown did not believe that C.C. would be able to function independently in society or that he would be able to meet his basic needs.

---

[2]Specifically, Brown explained,

8

Brown also referred to C.C.'s "last elopement attempt . . . in June of 2023." Brown testified, "Apparently, he walked out the front door of the unit where he's at and he had to be restrained by staff because he was trying to elope." According to Brown, had C.C. made it out of the facility, he would have likely been a serious threat to others because of his delusions and because he was awaiting trial for allegedly murdering his mother. Yet, Brown conceded that he did not know of any incidences where C.C. had made a threat to another person or had harmed anyone else or himself. Brown believed that C.C.'s then-current condition would continue for ninety more days and that extending his hospital stay for another twelve months would be in C.C.'s best interest.

C.C. also testified at the October 23 hearing. According to C.C., if he were allowed to leave the hospital, he would not attempt to hurt himself or anybody else. C.C. said, "I might be able to live with . . . some family member for a little bit, at least until I can get a job . . . working on the power lines." However, he did not know which family members would allow him to live with them. When asked how he came to the realization that he wanted to work on power lines,

---

A  . . . . Just to recap the previous account of the throat ring, and this is not going to make sense for the Court, but he claimed when he was originally admitted that the throat ring was placed in his abdomen when he was a baby; that the throat ring started emitting Wi-Fi, some kind of energy transfer; that worms went into his brain, there was a wormhole that was created; and somehow some tooth, like a tooth in your mouth, got incorporated into the throat ring device. That throat ring gradually moved into his throat.

He, originally when he was admitted, talked about how his mom might have been a vampire and that the throat ring had something to do with his mother as well, who was allegedly murdered by [C.C.].

. . . .

A  At least based on my observation, he still talks about the throat ring[,] but he maybe has more sense not to disclose too much about it. In other words, he's guarded. He'll admit that it's there, that it's bothering him, that sometimes it'll tighten, but he doesn't go into the level of detail as when he first got here."

9

C.C. said, "I have a lead, I guess you could say." He continued, "I don't know what to say, but . . . it's a friend from the before facility." C.C. said that he believed he could care for himself pending his trial, but he also asked, "Does 'pending' mean after?"

On cross-examination, C.C. said that he did not have schizophrenia, that he did not need to take medication, and that he had a throat ring that caused him problems.

C.C. contends that the evidence was legally insufficient to support the trial court's finding that C.C. was mentally ill and that he was likely to cause harm to himself or others. *See* TEX. HEALTH & SAFETY CODE ANN. § 574.035(a)(2)(A), (B). We agree that the trial court made an affirmative finding pursuant to subsections (A) and (B). But, contrary to C.C.'s argument regarding the lack of evidence to support the trial court's finding pursuant to subsections (A) and (B), subsection (a)(2) of Section 574.035 requires only that the court make at least *one* finding and that that particular finding be supported by clear and convincing evidence. This is so because the statute contains the word "or" rather than "and."[3]

In addition to finding that C.C. was likely to cause harm to others and to himself, the trial court also made a finding that there was clear and convincing evidence to recommit C.C. to the hospital for treatment pursuant to Section 574.035(a)(2)(C), that is, if C.C. did not continue with his treatment, he would "suffer severe and abnormal mental, emotional, or physical distress . . .

---

[3]Section 574.035(a)(2) states that the trial court must find by clear and convincing evidence that a patient's mental illness results in one of three things: (A) he "is likely to cause serious harm to [himself], (B) he "is likely to cause serious harm to others," or (C) he is "suffering severe and abnormal mental, emotional, or physical distress," "experiencing substantial mental or physical deterioration" that is shown by the "patient's inability . . . to provide for [his] basic needs," and he is "unable to make a rational and informed decision" about his treatment.

Here, we find that there was clear and convincing evidence to support the trial court's finding made pursuant to subsection (C). However, our reasoning should not be interpreted to mean that the record was absent of clear and convincing evidence to show that C.C. would be likely to cause harm to himself or others if he were not recommitted to the hospital. *See* TEX. HEALTH & SAFETY CODE ANN. § 574.035(a)(2)(A), (B).

10

[and was] experiencing substantial mental or physical deterioration of [his] ability to function independently." *See* TEX. HEALTH & SAFETY CODE ANN. § 574.035(a)(2)(C). In other words, the trial court determined that, if C.C. were released from the hospital, he would not be able to provide for himself, either physically or emotionally, nor would he be able to make "rational and informed decision[s] as to whether or not to submit to treatment." *Id.*

At the hearings, both doctors testified that, if C.C. were allowed to leave the hospital and to discontinue his treatment, he would likely cause harm to himself or others based on the fact that he would not voluntarily submit to the administration of the medication that he was prescribed for an illness that he did not believe he had. In addition, C.C. stated that the fictitious throat ring was still giving him problems, which was evidence that he was still exhibiting signs of delusions. Furthermore, C.C. was not able to identify a place where he could live in the event he left the hospital, nor was he able to describe the manner in which he would be able to financially support himself. Moreover, C.C. did not understand that he had been charged with a very serious offense or that, if he were convicted, he would be confined to prison for a substantial amount of time. Instead, he believed that all his problems would be alleviated if the court allowed him to leave the hospital and discontinue his treatment.

From this record, we conclude that there was clear and convincing evidence from which the trial court could have found (1) that C.C. was suffering from substantial mental, emotional, or physical distress, (2) that he could not function independently in society, (3) that he was unable to make rational decisions about his medical treatment, and (4) that, without treatment, he would continue to suffer from those disabilities.

11

C.C. also maintains that the evidence was insufficient to support the mandates of Section 574.035(e). Subsection (e) defines "clear and convincing" and states that

> the evidence must include expert testimony and evidence of a recent overt act or a continuing pattern of behavior that tends to confirm:
>
> > (1)    the likelihood of serious harm to the proposed patient or others; or
> >
> > (2)    the proposed patient's distress and deterioration of the proposed patient's ability to function.

*See* TEX. HEALTH & SAFETY CODE ANN. § 574.035(e). According to C.C., the trial court erred when it "found that the threat of harm to others was substantial and based on actual dangerous behavior manifested by *some overt act or threats* in the recent past." (Emphasis added).

C.C. misstates the trial court's finding, which was that C.C. exhibited a "continue[d] pattern of behavior" that was likely to cause "serious harm to [C.C] or others." Certainly, the doctors' testimony, their reports, and C.C.'s own testimony amounted to clear and convincing evidence that, if C.C. were allowed to leave the hospital and to discontinue his treatment, there was a likelihood that C.C. would incur serious harm to himself due to his inability to provide for his basic needs. Moreover, there was clear and convincing evidence to show that C.C. exhibited a continued pattern of behavior that could result in serious harm to others, that is, he continued to maintain (1) that he did not have a mental illness, (2) that he only took medication because he was forced to do so, and (3) that, if he were released from the hospital, he would not take his prescribed medication. That evidence, combined with the doctors' testimony that C.C. was still suffering from delusions and that those delusions could result in harm to others, supported the trial court's finding that C.C. should remain hospitalized and subject to treatment.

12

We overrule C.C.'s first point of error.

**B.     The Trial Court's Order to Administer Psychoactive Medication Must Be Reversed**

On October 24, 2023, the trial court entered its medication order, authorizing "the Texas Department of Health and Mental Retardation . . . to administer to [C.C. specific] . . . psychoactive medication[]" "regardless of his refusal."[4]  On November 1, 2023, C.C. filed a motion to vacate the medication order, arguing that there were no pleadings to support the State's request or the trial court's order and that there was no hearing held on the issue.  The State did not file a response to C.C.'s motion, and it appears that the trial court did not rule on C.C.'s motion.

In his second point of error, C.C. contends, among other things, that the trial court erred when it entered its medication order, despite the fact that there were no pleadings on file and there was no hearing on the issue.  We agree.

There is no requirement that a treating physician file an application for an order to administer psychoactive medication in support of the State's request, but he may do so.  TEX. HEALTH & SAFETY CODE ANN. § 574.104(a) (Supp.).  But, if a treating physician does file an application, it must be filed with the court and state, among other things, "that the physician believes that the patient lacks the capacity to make a decision regarding administration of the psychoactive medication and the reasons for that belief[.]"  TEX. HEALTH & SAFETY CODE ANN. § 574.104(b)(1) (Supp.).  Here, there is an application in the record, but it does not contain the

---

[4]The order allowed the involuntary administration of the following drugs:   antidepressants, antipsychotics, anxiolytics/sedatives/hypnotics, and/or mood stabilizers.

13

court clerk's "filed" mark. Consequently, we do not know when the document was presented to the court. Likewise, there is nothing in the record to indicate that C.C. had notice that the application was filed.

C.C. also complains that there was no hearing on an application for an order to administer psychoactive drugs. Section 574.104(c), states, "An application [to administer psychoactive medication] filed under this section is separate from an application for court-ordered mental health services." TEX. HEALTH & SAFETY CODE ANN. § 574.104(c) (Supp.). Subsection (d) states, "*The **hearing** on the application [to administer psychoactive medication]* may be held on the date of a ***hearing** on an application for court-ordered mental health services . . . .*" TEX. HEALTH & SAFETY CODE ANN. § 574.104(d) (Supp.) (emphasis added). Subsection (d) clearly indicates that both hearings deal with a particular issue.

Additionally, Section 574.106 of the Texas Health and Safety Code states, in part,

(a)      The court may issue an order authorizing the administration of one or more classes of psychoactive medication to a patient who:

(1)      is under a court order to receive inpatient mental health services; or

(2)      is in custody awaiting trial in a criminal proceeding and was ordered to receive inpatient mental health services in the six months preceding a hearing under this section.

(a-1)    The court may issue an order under this section only if the court finds by clear and convincing evidence *after the hearing*:

(1)      that the patient lacks the capacity to make a decision regarding the administration of the proposed medication and treatment with the proposed medication is in the best interest of the patient; or

14

> (2)　if the patient was ordered to receive inpatient mental health services by a criminal court with jurisdiction over the patient, that treatment with the proposed medication is in the best interest of the patient . . . .

TEX. HEALTH & SAFETY CODE ANN. § 574.106 (Supp.) (emphasis added).

Here, there were two hearings that occurred on two separate days. Yaqoob testified at the October 18 hearing, and Brown and C.C. testified at the October 23 hearing. While the issue of the involuntary administration of medication to C.C. was briefly touched upon during both hearings, neither the trial court nor the parties ever referred to an application to administer psychoactive medication or a hearing on that application.

Moreover, subsection (d) states that the hearing "shall be held not later than 30 days after the filing of the application for the order to authorize psychoactive medication." TEX. HEALTH & SAFETY CODE ANN. § 574.104(d). Even if we were to consider the October 18 and the October 23 hearings to be hearings on the application for an order to authorize psychoactive medication, without a file-marked application in the record, we are unable to determine if the hearings were timely.

For these reasons, we sustain C.C.'s second point of error, reverse the trial court's order to administer psychoactive medication, and remand this case to the trial court to hold a hearing on that particular issue.

## V.　Conclusion

We find that there was legally sufficient evidence to support the trial court's judgment ordering C.C.'s recommitment for extended, in-patient mental health services, and we affirm that

15

judgment; however, we reverse the trial court's order to administer psychoactive drugs and remand this case to the trial court for proceedings consistent with this opinion.


Scott E. Stevens
Chief Justice

Date Submitted:    December 12, 2023
Date Decided:     January 24, 2024